**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                :
UNITED STATES OF AMERICA        :
                                :        1:22-cr-00467-NLH
        v.                      :
                                :
ANAEL SALINAS,                  :
                                :        **OPINION**
                Defendant.      :
_____ :

<u>**APPEARANCES**</u>:

LORI M. KOCH
FEDERAL PUBLIC DEFENDER'S OFFICE
800-840 COOPER STREET
SUITE 350
CAMDEN, NJ 08102

        _Counsel for Defendant_

ANDREW B. JOHNS
OFFICE OF THE US ATTORNEY
US POST OFFICE BUILDING
401 MARKET STREET - 4TH FLOOR
CAMDEN, NJ 08101

        _Counsel for the United States_

<u>**Hillman**</u>, **District Judge**

        Before the Court is Anael Salinas's ("Defendant") Motion to
Dismiss the Information filed against him after he waived his
right to indictment.  (ECF 40).  For the reasons expressed
below, Defendant's motion will be denied.

<u>**Background**</u>

        Defendant was born in 1976 in San Vincente, El Salvador and
first crossed into the United States in 1996.  (ECF 40-1 at 3).

He went to North Carolina to work with his brother in construction.  (Id.)  On October 31, 2002, Defendant was convicted in the North Carolina General Court of Justice, for the offenses of Trafficking Cocaine-Possession and Conspiracy to Traffic in Cocaine-Possession, in violation of N.C. Gen. Stat. Ann. §§ 90-95(h) and 90-95(i).  (Id.)  Unlike federal law which requires the government to prove intent to distribute regardless of the amount of drugs seized, North Carolina law, at least at the time of Defendant's conviction, created a form of statutory presumption that possession of an amount of drugs over a certain amount established an intent to traffic in those drugs.  See N.C. Gen. Stat. Ann. §§ 90-95(h)(3) (terming possession over a certain amount of cocaine as "trafficking in cocaine").

On February 7, 2003, Defendant received a Notice of Intent to Issue a Final Administrative Removal Order (the "2003 Notice"), and was interviewed by a U.S. Immigration Agent in conjunction with the 2003 Notice.  (Id. at 3).  It is undisputed that the 2003 Notice was translated for the Defendant into Spanish during the interview and the Immigration Agent attested to that fact on the form.  (ECF 40-1 at 3; ECF 41 at 2).  The 2003 Notice stated that the Defendant would not receive a hearing before an Immigration Judge because it had been determined that his convictions in North Carolina were

aggravated felonies under 8 U.S.C. § 1101(a)(43)(B).  (ECF 41 at 2).

The 2003 Notice further informed Defendant on the front of the form, as explained to him in Spanish, that he had two appellate rights as follows: a) he had 10 days to respond to the administrative charge in writing to the "United States Department of Justice, Immigration and Naturalization Service" at an "ICE" address in Atlanta, Georgia from where Defendant was ultimately deported;[1] and b) he had a separate right to seek judicial review within 14 days of entry of the final administrative removal order that would be filed against him later.  (Id.; ECF 40-2 at 14).

On the back of the 2003 Notice is a lined-off section entitled "I Wish to Contest and/or Request Withholding of

---

[1] Defendant's deportation process which began in 2002 straddles the time when such proceedings were the province of the Immigration and Naturalization Service ("INS"), a component of the Department of Justice, and the subsequent creation of the Department of Homeland Security ("DHS") and its Immigration and Customs Enforcement Division ("ICE") which assumed the duties of INS.  It appears that ICE and DHS continued to use the old INS forms even after ICE was created as the 2003 Notice, a Department of Justice INS form I-851, provided an address for "ICE".  (See ECF 40-2 at 14).  Neither the Government or the Defendant have been able to provide the Court with the version of the INS form I-851 that resulted from Defendant's initial encounter with immigration officials in 2003, a form that was obviously added to in 2005 as described in more detail in this Opinion.  Nonetheless, Defendant does not contest what the form states – namely that he was provided with an address to file his administrative appeal in 2003.

Removal" with boxes that could be checked.  (ECF 40-2 at 14).
The grounds for an administrative appeal are limited but one of
them is "I was not convicted for the criminal offense described
in allegation number 6 above[.]"  (Id.)  Allegation number 6
references an INS form "I-831" which has not been provided to
the Court.  (Id. at 13).  Directly below that, however, under
the heading "Charge:" Defendant's offense is described as "an
aggravated felony as defined in . . . 8 U.S.C. 1101(a)(43)(B)" a
determination Defendant now challenges almost 20 years later.
(Id.)

If Defendant believed in 2003 that he was not convicted of
an offense that qualified as an aggravated felony under the
relevant statute he had every opportunity to file an
administrative appeal of that determination.  Yet, it is
undisputed that Defendant did not file an administrative appeal
of the 2003 Notice within 10 days or at any time thereafter.
The lined-off section on the back of the form, designed to
facilitate a notice of appeal, is left blank, and the
Immigration Agents signed at attestation that the Defendant
refused to sign the form acknowledging that he had received it.
(Id. at 14).

Over the next approximately two years, Defendant
unsuccessfully appealed his North Carolina conviction and served
his state sentence subject to an immigration detainer.  State v.

4

Valladares, 165 N.C. App. 598, 608, 599 S.E.2d 79, 87, writ denied, review denied, appeal dismissed, 359 N.C. 196, 608 S.E.2d 67 (2004) (opinion on Defendant's appeal of his conviction).

Defendant's felony conviction also had a negative effect on his Application for Temporary Protected Status and I-765 Application for Employment Authorization he had filed on October 24, 2001. (ECF 40-2 at 5). On October 18, 2004, the Department of Homeland Security ("DHS") sent Defendant a written "Notice of Decision to Deny" those applications based upon his conviction and advised the Defendant of his right to appeal that decision within 30 days and the process for doing so. (Id.) As with the 2003 notice, Defendant did not appeal that decision within required time (30 days) or any time thereafter.

On June 10, 2005, a Final Administrative Removal Order was entered against the Defendant ("Final Order"). (ECF 41 at 3). On July 13, 2005, DHS prepared a warrant of removal based on the Final Order. (Id.) An ICE Field Office Director deemed Defendant deportable pursuant to § 237(a)(2)(A)(iii) of the Immigration and Nationality Act (the "INA"). (ECF 40-1 at 3-4). On July 15, 2005, Defendant received either the original or a second copy of the partially filled out 2003 Notice ("2005 Notice") as well as a copy of the Final Order. (Id. at 4). Unlike the first time the same form was presented to him in

5

2003, there is no written evidence that the documents were translated for him into Spanish and Defendant denies that it was translated the second time he saw the INS form I-851.  (Id.)

At that time, Defendant signed another lined-off section of the form directly under the section left blank for an administrative appeal, this one entitled: "I Do Not Wish to Contest or Request Withholding of Removal."  (ECF 40-2 at 14). A checked box indicates the Defendant admitted the charges in the 2005 Notice, that he was deportable, and that he was not eligible for relief.  (Id.)  The same box also indicated that the Defendant waived his right to appeal, waived a 14-day stay of the Order presumably to perfect an appeal, and expressed a desire to be deported to his home country of El Salvador.  (Id.)

Notably, and in contrast to the 2005 Notice, on the Final Order itself, presented to Defendant on July 15, 2005, a box was checked that Defendant reserved his right to petition for review.  (Id. at 45)  Defendant does not contest that he reserved that right when he was presented with the Final Order. (ECF 40-3 at 3).  (Id.)  The same reservation of right to appeal was indicated on a Quality Assurance Worksheet (the "Worksheet") prepared by DHS Officers on July 13, 2005.  (ECF 40-2 at 29). Although the Final Order and the Worksheet are in conflict with the 2005 Notice, the fact that they reflect a desire of the Defendant to contest his deportation at that time is some

evidence that Defendant, who claims not to understand English, was able to communicate his desire to appeal his deportation at the time the process was at its end.

Despite being notified in Spanish of his right to seek judicial review of a final order when he was presented with the 2003 Notice and despite reserving his right to seek such review of the Final Order when advised of the right again on July 15, 2005 as evidenced on the Final Order itself, and despite expressing at least orally a desire to seek review of the Final Order, Defendant did not seek judicial review of the Final Order within 14 days or, for that matter, any time thereafter.  On August 13, 2005, roughly one month after receiving the Final Order, and fifteen days after his right to seek judicial review expired, Defendant was deported from the United States to El Salvador, the country he expressed a desire to return to.  (ECF 41 at 3).

Over fifteen years later, on November 20, 2020, Defendant was encountered by DHS officers outside a pharmacy in Harrison Township, Gloucester County, New Jersey and that encounter serves as the basis of the instant prosecution.  (Id. at 4). The Government originally filed a criminal complaint against

Defendant on January 6, 2021 for illegal reentry into the United States in violation of 8 U.S.C. §§ 1326(a) and (b)(2).  (ECF 1).

On July 11, 2022, the Government superseded the criminal complaint with an information (the "Information") also for violation of 8 U.S.C. §§ 1326(a) and (b)(2).[2]  (ECF 35). Thereafter, on July 25, 2022, Defendant filed the instant Motion to Dismiss the Information.  (ECF 40).  The Government filed a response in opposition on August 5, 2022, (ECF 41), and Defendant filed a reply in further support of his motion on August 29, 2022.  (ECF 43).

On September 20, 2022, the Court held a hearing on the motion.[3]  (ECF 44).  Defendant's collateral attack on the Information is based on the contentions that: (1) the INS/ICE officials erroneously concluded that his North Carolina conviction was an aggravated felony; and (2) that his waiver of an appeal was not knowing and intelligently made because he was not advised of his rights in Spanish. (See generally ECF 40).

---

[2] Defendant waived prosecution by indictment on July 11, 2022. (ECF 37) in order to join before the District Court the issue of whether he received due process in the 2003-05 deportation process.

[3] The Court also invited the parties to file supplemental briefing if they felt that it was necessary, but they have elected not to do so.

The Court renders its decision today against this factual backdrop.

**A. Legal Framework**

Title 8, U.S.C. § 1326(d) allows a criminal defendant charged with illegal reentry to collaterally attack the underlying deportation order that serves as the basis of the criminal prosecution if he demonstrates three things: "(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and (3) the entry of the order was fundamentally unfair."  (Id.)  A defendant is required to satisfy all three prongs of § 1326(d) in order to collaterally attack his prosecution for illegal reentry and have the prosecution dismissed.  United States v. Palomar-Santiago, 209 L. Ed. 2d 703, 141 S. Ct. 1615, 1619 (2021) ("The question for the Court is whether Palomar-Santiago is excused from making the first two of these showings, as the Court of Appeals for the Ninth Circuit held, because his prior removal order was premised on a conviction that was later found not to be a removable offense. The Court holds that the statute does not permit such an exception.").

In evaluating the exhaustion requirement, a waiver of appeal rights in an immigration proceeding must be knowingly and

9

intelligently made.  Richardson v. United States, 558 F.3d 216, 220 (3d Cir. 2009).  When it comes to the deportation of an alien who does not speak English, there is authority for the proposition that a failure to translate the documents salient to the deportation into the deportee's native tongue can constitute an exception to the exhaustion rule.  See United States v. Reyes-Bonilla, 671 F.3d 1036, 1044 (9th Cir. 2012) (finding no considered and intelligent waiver when the defendant testified that he did not read English and that his deportation officer did not explain the contents of the Notice of Intent to him, and the government relied on notation that officer "explained and/or served" its contents in Spanish without adducing evidence as to officer's ability to communicate in Spanish); see also United States v. Angel-Huerta, 718 F. App'x 105, 109 (3d Cir. 2017) (citing Reyes-Bonilla with approval regarding the translation issue).

In considering whether a defendant received a proper translation, the same analysis that animated the discussion of whether there was a knowing and intelligent waiver applies to whether the defendant was deprived of the opportunity for judicial review.  United States v. Charleswell, 456 F.3d 347, 357 (3d Cir. 2006) ("We therefore find analogous the line of cases beginning with Copeland establishing that where an alien is misled to believe that he has no opportunity for judicial

10

review, the lack of an affirmative notice of the right to an appeal may combine to constitute a denial of the meaningful opportunity for judicial review[.]"); United States v. Copeland, 376 F.3d 61, 68 n.6 (2d Cir. 2004) ("Where a waiver of the right to appeal is not knowing, an alien is deprived of the opportunity for judicial review."); United States v. Sam-Pena, No. CR2100888001PHXGMS, 2022 WL 1443767, at *5 (D. Ariz. May 6, 2022) (noting that a faulty waiver often meant that the defendant was denied an opportunity for judicial review).

A showing of fundamental unfairness of the underlying immigration proceeding is the final prong that a defendant must establish to prevail on a collateral attack on an indictment for illegal reentry. "There are at least two avenues by which a proceeding can be fundamentally unfair. First, as addressed in [United States v. Torres, 383 F.3d 92 (3d Cir. 2004)], a proceeding may be fundamentally unfair where it deprives an alien of some substantive liberty or property right such that due process is violated." Charleswell, 456 F.3d at 359. "Second, a proceeding may be fundamentally unfair where an agency has violated procedural protections such that the proceeding is rendered fundamentally unfair." Id. at 360.

## B. Analysis

The Court takes each of the prongs in turn, noting that Defendant's arguments regarding translation are most relevant

11

for the first two prongs and his arguments regarding the designation of his North Carolina conviction as an aggravated felony is relevant for the third.

The question for the first prong is whether Defendant should be excused from not having responded to the charge in the 2003 Notice within 10 days.  The answer to this question turns on whether Defendant received a sufficient translation such that his failure to respond to the 2003 Notice constituted a waiver of his administrative appeal rights.

At the outset, the Court notes that the parties do not dispute that Defendant received a translation of the 2003 Notice into Spanish and that the 2003 Notice made clear Defendant's right to challenge administratively the legal judgment and factual conclusion in the notice.  (ECF 40-1 at 3; ECF 41 at 2). The 2003 Notice stated clearly under the heading "Your Rights and Responsibilities" that Defendant had 10 days to respond to the charges in the Notice by mailing such a response to a specific address listed for ICE.  (ECF 40-2 at 13-14) ("You must respond to the above charges in writing to the Service address provided on the other side of this form within 10 calendar days of service of this notice (or 13 calendar days if service is by mail).").  (Id. at 13).

Nor does the Defendant's decision to refuse to acknowledge receiving the notice at the time help his cause.  The Court

finds Defendant's refusal to sign the 2003 Notice to be probative of the fact that he understood his right to an immediate administrative appeal process or was at least willfully blind to that right.  If Defendant knowingly and intentionally refused to participate in the notice process, he should be estopped from arguing he was unaware of his administrative appeal rights and such conduct should constitute a conscious waiver of that right and definitive as to a failure to exhaust.

To be clear, a failure to translate can constitute an exception to the exhaustion rule.  Reyes-Bonilla, 671 F.3d at 1044.  And the question of whether the documents were translated comes down to an issue of credibility, courts have sometimes held evidentiary hearings and taken testimony from the defendant and the immigration officer who presented him with the documents.  United States v. Reyes-Romero, 959 F.3d 80, 86 (3d Cir. 2020), cert. denied, 209 L. Ed. 2d 750, 141 S. Ct. 2622 (2021) (discussing the district court's hearing in which it heard testimony on translation of materials for defendant); see also United States v. Chaves-Leiva, 782 F. App'x 142, 144 (3d Cir. 2019) (same).

But no such hearing is necessary in this matter because it is not disputed that the 2003 Notice translated into Spanish clearly apprised Defendant of his administrative appeal rights.

The 2003 Notice clearly and unambiguously stated what options Defendant had to challenge his deportation.  (ECF 40-2 at 13).  And it is similarly uncontested that at no point did Defendant exhaust his administrative remedies, not within ten days of the 2003 Notice, at no time prior to his 2005 deportation and not in the 17 years after.  It is Defendant's burden to show administrative exhaustion was not required for this collateral attack, Meza-Magallon, 2017 WL 11611881 at *5, and he has failed to meet that burden.

This point leads into the second prong that Defendant must meet to mount a successful collateral attack to the Information: that he was improperly denied the right to judicial review in his immigration proceedings.  8 U.S.C. § 1326(d)(2).  Defendant has not met that prong, much for the same reasons why the Court does not deem him to be exempt from the administrative exhaustion requirement.

The Court's review of the administrative record submitted by both the Government and the Defendant reveals that the 2005 Notice was a copy (or the original) of the partially filled out 2003 Notice with some additional portions of the form that were completed in July 2005.  (See ECF 40-2 at 14).  On the 2005 Notice, Defendant checked a box admitting the allegations in the 2005 Notice, that he was deportable and that he was not eligible for any form of relief from removal.  (Id.)  He further waived

14

his right to rebut and contest the charges and to file a
petition for review of the Order and he stated that he did not
wish to request withholding or deferral of removal.  (Id.)
Defendant filled in the blank on the 2005 Notice that he wished
to be removed to "El Salvador" and checked the box stating, "I
also waive the 14 day period of execution of the Final Removal
Order."  (Id.)  Finally, he affixed his signature to the form.
(Id.)

Because Defendant signed the 2005 Notice indicating that he
waived his right to contest his removal, he bears the burden of
showing that his waiver was not knowing and intelligent.  United
States v. Meza-Magallon, No. CR 17-379, 2017 WL 11611881, at *5
(E.D. Pa. Nov. 17, 2017), aff'd, 779 F. App'x 80 (3d Cir. 2019)
("Where there is a written waiver of rights in a deportation
proceeding, the alien bears the burden of proving that the
waiver is invalid.  A waiver will be held invalid when the alien
was not advised of his rights in a language he could understand.
In cases where there is a written waiver, this issue frequently
comes down to an issue of credibility.") (internal citations
omitted).

Defendant contends that when the 2005 Notice and Order were
presented to him on July 15, 2005, those documents were not
translated for him again into Spanish as they had been in 2003.
While it is true that the evidence establishing a discussion in

15

a language Defendant understood is less persuasive as it relates
to the discussion with immigration officers in 2005 than it is
of 2003 Notice, the Court is still convinced that Defendant
knowingly and intelligently waived his judicial review rights in
2005.  Other than his self-serving denial to the contrary, all
the other evidence suggests Defendant was aware of his right to
judicial review.

First, there is his signature on the 2005 Notice.  It
strains credulity that the Defendant signed the form in 2005
with boxes checked without understanding it after years of
applying for legal status in the United States and going through
the administrative deportation process as well as a criminal
trial and the appellate process of his state court conviction.
This is especially so since the record establishes that
Defendant had once exercised his prerogative to refuse to
acknowledge the same form in 2003.  His affirmative act of
signing the 2005 version is in sharp contrast and speaks to a
knowing act.

Second, there is direct evidence that Defendant discussed
his right to judicial review in a manner he understood in the
circumstances surrounding the 2005 Notice.  Whether that
discussion occurred after signing the 2005 Notice waiver or
before, it clear that Defendant, at some point on July 15, 2005,
orally expressed his wish to reserve his right to appeal as

16

reflected in both the Final Order and Worksheet.  If Spanish is all he speaks and understands, as Defendant contends, it follows that that discussion must have occurred in Spanish in order for the immigration officer to have noted it on both those documents.  (See ECF 40-2 at 14).  The act of reserving those rights is a strong indication that there was a meaningful conversation in Spanish regarding the 2005 Notice, the Final Order and Defendant's right to judicial review.

But perhaps most importantly, Defendant's argument fails to appreciate that the 2005 Notice and the 2003 Notice are one and the same document.  More specifically, there is no dispute that Defendant was told in Spanish in 2003 that he had the right to seek judicial review within 14 days of the entry of the final deportation Order when issued.  Defendant's argument devolves into one that due process requires he receive notice of his right to judicial review not once but twice, once in 2003 and again in 2005.  Even if that view of the law were correct, despite receiving notice of his right to judicial review in Spanish in 2003 and despite indicating that he wanted to seek such review during the process surrounding the 2005 Notice and the service of Final Order, Defendant never sought judicial review in the month between receiving the 2005 Notice and his deportation on August 13, 2005.

At the September 20, 2022 hearing, Defendant seemed to suggest that his failure to seek judicial review should be excused because he was not given instructions on how to initiate an appeal.  The Court disagrees.  First, Defendant does not cite a case that holds that due process requires specific instructions on how to commence an appeal in this context or an analogous one and the Court is not aware of such a case.  While there is some support for the proposition that an affirmatively misleading notice regarding how to seek judicial review constitutes a deprivation of that right, there is no evidence of misleading language here.  See Charleswell, 456 F.3d at 356-57 (holding that where a notice stated that an alien could seek review before an immigration judge but did not mention judicial review, "reasonable persons reading this Notice would be led to believe that their only avenue for relief if they desire to contest the reinstatement order would be to make either a written or oral statement to the immigration officer").  Notably, the 2003 Notice was different.  It affirmatively said, "You may seek judicial review of any final administrative order by filing a petition for review within 14 calendar days after the date such final administrative order is issued, or you may waive such appeal by stating, in writing, your desire not to appeal."  (ECF 40-2 at 13).

18

Second, there is authority for the proposition that because an Order of deportation is so drastic a measure, its entry should be enough to put an individual on notice to affirmatively look for judicial avenues for relief.  See United States v. Lopez, 445 F.3d 90, 95 (2d Cir. 2006) ("Nothing in Mendoza-Lopez, however, indicates that this principle requires a right to notice about the availability of judicial review. The right to petition for habeas relief from an order of deportation is provided by statute. 28 U.S.C. § 2241; St. Cyr, 533 U.S. at 314, 121 S.Ct. 2271. Because 'deportation is a drastic measure and at times the equivalent of banishment or exile,' Fong Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948), the receipt of a final order of deportation ordinarily would put an alien on notice to look for remedies for that order.").[4]  In the month between Defendant's receipt of the Order of deportation and his removal from the country, he took no action to seek judicial review.  The Court finds no deprivation of his rights under those facts.

---

[4] The Third Circuit cited this case with approbation for the idea that affirmative misinformation denies judicial review but stated that it did not need to go as far as the Second Circuit did in Lopez because the facts in Charleswell were so much worse.  Charleswell, 456 F.3d at 355.  In any case, this Court finds the logic of Lopez consistent with the reasoning in the Third Circuit case law and otherwise persuasive.

Finally, the Court does not find, as to the third prong, that the immigration proceedings were fundamentally unfair. Wrapped up in this contention is not only Defendant's argument regarding translation but also his contention that his North Carolina conviction was improperly designated as an aggravated felony.  (ECF 40-1 at 12).  Defendant argues that the designation of Defendant's conviction as an aggravated felony deprived him of the opportunity to obtain Temporary Protected Status[5] and to apply for voluntary departure.[6]  (Id.)  Aliens convicted of aggravated felonies are subject to expedited removal proceedings that do not allow them the chance to appear before an Immigration Judge, seek voluntary departure or seek cancellation of removal.  8 U.S.C. § 1228; United States v. Almanza-Vigil, 912 F.3d 1310, 1312 (10th Cir. 2019) (explaining the parameters of expedited proceedings).

The Court sees no authority for the proposition that Defendant's North Carolina conviction was improperly designated

---

[5] Individuals with Temporary Protected Status are not removable from the United States, can obtain an employment authorization document, and may be granted travel authorization. TEMPORARY PROTECTED STATUS, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, https://www.uscis.gov/humanitarian/temporary-protected-status (last visited September 30, 2022).

[6] Voluntary departure allows an alien to apply later for a visa in order to legally enter the United States.  See Succar v. Ashcroft, 394 F.3d 8, 14 (1st Cir. 2005).

an aggravated felony at the time of Defendant's conviction and
removal.  Accepting as true Defendant's contention and the
Government's concession that the conviction would not be
considered an aggravated felony today given the Supreme Court's
subsequent holding in Moncrieffe v. Holder, 569 U.S. 184, 190,
133 S. Ct. 1678, 1684, 185 L. Ed. 2d 727 (2013), there is no
authority in the Third Circuit that Moncrieffe applies
retroactively.

    Indeed, the Fourth Circuit has suggested that a designation
of a felony as an aggravated felony, if it was correct at the
time of the designation, is not error in retrospect.  United
States v. Lopez-Collazo, 824 F.3d 453, 465 (4th Cir. 2016)
("The plea colloquy confirmed all of these facts as well.
Accordingly, it is clear that, under the law as it was
understood in 2007, Lopez-Collazo's second-degree assault
conviction constituted. . . an 'aggravated felony' under the
INA.").  Thus, because there is no opportunity for discretionary
relief such as voluntary removal for an alien convicted on an
aggravated felony, it follows that Defendant was not prejudiced
even if he did not receive a Spanish translation because
expedited removal was the only possible outcome regardless of
any translation.  Charleswell, 456 F.3d at 361 (the defendant
seeking to show prejudice must show "a reasonable likelihood
that the result would have been different if the error in the

21

deportation proceeding had not occurred[.]"); see also United States v. Alvarado-Pineda, 774 F.3d 1198, 1201 (9th Cir. 2014) ("As a general matter, a defendant who has been convicted of an aggravated felony cannot show that he was prejudiced by defects in his underlying proceedings.  This is so because noncitizens convicted of aggravated felonies are removable on that basis[.]") (internal citations omitted).

Further, even if this Court were to hold that Defendant was improperly designated as an aggravated felon, it is entirely speculative whether an Immigration Judge would have granted Defendant voluntary departure or whether Defendant would have obtained Temporary Protected Status. Charleswell, 456 F.3d at 361; see also Delgado-Sobalvarro v. Att'y Gen. of U.S., 625 F.3d 782, 787 (3d Cir. 2010) (discussing fundamental fairness in the context of immigration proceedings and stating, "Not only are these contentions entirely speculative, but they do not give rise to any demonstrated prejudice, let alone substantial prejudice.  Accordingly, the petitioners are not entitled to relief on these due process claims.").  And as noted previously, Defendant did not seek to appeal his denial of Temporary Protected Status at the time of that adverse decision despite having been advised of that right, yet another example of Defendant's knowing waiver of appellate rights.  Defendant has simply not shown prejudice either from the designation of his

conviction as an aggravated felony or from the alleged failure to translate the 2005 Notice and Order.[7]

**Conclusion**

Defendant has cited no authority for the proposition that Defendant must be afforded due process twice lest the Court be compelled to conclude that the process he did receive was inadequate. Here, the Defendant was afforded the process he was due when it was explained to him in Spanish that he had a right to seek administrative review of the initial 2003 Notice and judicial review of the 2005 Final Order. Despite being advised of both of those rights in Spanish, he took advantage of neither. As Defendant fails to meet all three prongs of the standard under 8 U.S.C. § 1326(d) that must be met to challenge his deportation, his Motion to dismiss the Information (ECF 40) must be denied.

An accompanying Order will issue.

Dated: <u>October 12, 2022</u>    <u>s/   Noel L. Hillman</u>
At Camden, New Jersey    NOEL L. HILLMAN, U.S.D.J.

---

[7] This Court is cognizant of footnote 17 in <u>Charleswell</u> which stated, "some procedural defects may be so central or core to a proceeding's legitimacy, that to require an alien to establish even a 'reasonable likelihood' that he would have obtained a different result establishes too high a burden." <u>Charleswell</u>, 456 F.3d 347, 362 n.17. The Third Circuit has not expounded on what defect would meet that standard, but the Court finds that it is not relevant to the instant proceedings as there is undisputed evidence of the Spanish translation of the 2003 Notice and no error in the designation of Defendant's conviction as an aggravated felony.